UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:16CR207(AWT) |
| V. | : | |
| RAMON GOMEZ | : | November 29, 2017 |

## SENTENCING MEMORANDUM

### I. Introduction

The circumstances of this case are heartbreaking; on May 29, 2016 a 17-year-old girl, overdosed on drugs and lost her life. This happened in a motel room at the Flagship Inn in Groton where O.R., along with two older women, was prostituting herself. The chain of events which lead to Ms. O.R.'s death is riddled with tragedy.

On May 27, 2016 O.R. contacted the defendant, Ramon Gomez, for help. had been thrown out of the place where she had spent the night and was looking for some place to go. O.R. had a troubled history and was living a chaotic life. hoped that Mr. Gomez could direct her to a place where she could both find shelter and make money. Unfortunately, Mr. Gomez did just that. He informed Ms. O.R. that she could stay with a friend of his, Adele Bouthillier, and make money the same way that Adele did, by advertising herself on Back Page and engaging in prostitution. In exchange for the introduction, he asked her to pay him part of the money she earned through this illicit trade. Ms. O.R. willingly agreed and Mr. Gomez arranged for Ms. O.R. to be driven to the Flagship Inn.

1

Ms. Bouthillier then "posted" O.R. on Back Page and assisted her in engaging in prostitution. While O.R. did thereafter engage in prostitution, she immediately decided that she would work independently with Ms. Bouthellier. Her texts reflect that she told Mr. Gomez that she did not think he should be paid anything and the two parted company thereafter, albeit not without some unpleasantness on Mr. Gomez's part.

O.R. had a history of abusing drugs. Her text messages with friends and acquaintances include references to weed, molly (ecstasy), cocaine and heroin (generally known as "D" for dope). Her texts also demonstrate that she was quite promiscuous, frequently engaging in sexual activity with numerous partners and often exchanging explicit photos with other acquaintances. Indeed, O.R.'s text messages on the day before she died indicate that she was looking for heroin in the early morning of May 28th (text to "Will", looking for some "D"). It is not clear whether this individual ever came to the motel in response to that request. Furthermore, at 3:25 AM on the 28th, she was also looking for a ride to Norwich to get some "D" (text with "James"). At 6:36 AM, she was exchanging texts with both "James" and "Thuro" about getting "70$ worth." Whether or not these sales happened is unknown but what they do evidence is that O.R. was actively searching for drugs from her own sources early that morning.[1]

On May 28, 2016, Mr. Gomez responded to a call from Ms. Bouthillier asking to purchase heroin. He agreed and delivered one gram ($70 worth) of heroin to her at the motel around 8:30 AM on May 28, 2016. The timeline of events thereafter is very

---

[1] O.R.'s texts also indicate that she spoke with numerous other individuals about getting heroin (e.g. her texts with "Jay" and "La" on May 21, 2016, and "Kyle" on May 24, 2016.)

unclear.

According to Ms. Bouthillier, this heroin was thereafter immediately shared between Ms. Bouthellier, Melissa Crickwood, another prostitute who was sharing the room at the motel, and  O.R.   According to Ms. Bouthellier, she and Ms. Crickwood injected their drugs whereas O.R.  ingested her's by snorting the drugs.  What is undisputed is that it was Ms. Bouthellier, not Mr. Gomez, who provided these drugs to  O.R.

Furthermore, neither Ms. Bouthellier nor Ms. Crickmore, who also shared in this batch of heroin, suffered an overdose from the drugs they consumed.[2]

It is not clear when the heroin obtained from Mr. Gomez was completely consumed.  Initially, Bouthellier claimed that O.R.  had immediately snorted the heroin and that she and Ms Crickmore injected theirs.  If so, that would suggest that the drugs from Mr. Gomez may have been immediately used up early on the morning of the 28th. It is undisputed that heroin was found in a fully loaded syringe that was recovered by the police in the dresser used by Ms. Bouthillier.[3]  This suggests that additional drugs may have been obtained that day from someone other than Mr. Gomez.

Bouthellier claimed that all three of the women thereafter went to sleep at about 10 AM until later that night.  This, however, does not account for  O.R.'s  phone records,

---

[2] It is possible of course that, as older addicts, their tolerance was higher than that of  O.R.  One would have expected, however, that if the heroin provided by Mr. Gomez had a very high concentration of fentanyl, that both of them would have suffered serious problems as well.

[3] Discovery provided to date does not indicate whether the heroin in that syringe included fentanyl, thus raising a question of whether there may have been another source of drugs on the premises, and thus a question as to the source of the other drugs.

which reflect that she was awake and sending texts as late as 12:11 PM on the 28th. Did she fall asleep at 10AM, then later wake up and go out on her own, perhaps looking for more drugs? That we will never know.

As to what happened next, we only have Ms. Bouthellier's account, claiming that she and Ms. Crickmore woke up at 10PM to find  O.R.  unresponsive.  At some point thereafter, she and Ms. Crickmore apparently brought or dragged  O.R.  into the bathroom.  What she and Ms. Crickmore did thereafter is not known.  What we do know is that the 911 call did not take place until the following morning at approximately 2:25 AM.

What is clear is that there was an outgoing text from Ms. Bouthellier's phone at 10:28PM to either a drug client or drug customer ("Jimi") who had previously been discussing "crack" purchases with Ms. Bouthellier.  This was followed by a series of incoming and outgoing texts on her phone between 10:35PM and 10:40PM. Furthermore, there was an incoming call to Ms. Bouthellier's phone as late as 11:22PM on May 28th, which appears to have been answered.[4]

Despite Bouthillier's phone activity between 10:35PM and 11:22PM, she made no call to medical providers or the police about  O.R.'s  condition until early the next morning. Thus it was not until after 2:25AM on May 29, that Ms. Bouthillier called 911 to report that Ms.  O.R.   was unresponsive. Police arrived at the motel at about 2:30AM

---

[4]The phone records distinguish between incoming, outgoing and missed calls. It could be that this incoming call was either received or perhaps went to voicemail. What is significant is that there was phone activity well prior to the time of the call for emergency help.

but were unsuccessful in their efforts to revive O.R.  Had Ms. Bouthillier or Ms. Crickmore acted more promptly, it is quite likely that O.R. would never have died.

While the actions of Ms. Bouthillier or Ms. Crickmore do not excuse Mr. Gomez' conduct, it does, however, put the sentencing of Ms. Bouthillier (her sentence was 48 months) into context here and should, we respectfully submit, influence the Court's ultimate conclusion as to the appropriate sentence for Mr. Gomez. It was Ms. Bouthillier and not Mr. Gomez, who provided the drugs to O.R. , and, even more significantly, it was Ms. Bouthillier (and Ms. Crickmore), who stood by and delayed any calls for assistance, until hours after O.R. was first found unresponsive, and by which time it was too late to revive her.

Mr. Gomez is aware of and remorseful for the harm he has caused, by initially directing O.R. to the Flagship Inn, and by selling drugs to Ms. Bouthillier.  Furthermore, he acknowledges the possibility that the drugs that he sold may have caused death, although in the circumstances of this case, this can never be known with any degree of certainty.  Significantly, in this case, the government has not charged that these drugs did in fact cause O.R.'s death, nor did the Court depart upwards under the Sentencing Guidelines to increase Ms. Bouthillier's sentence to reflect her role in causing O.R.'s death.[5]  Similarly, no such departure is warranted here for Mr. Gomez.

Mr. Gomez, plead guilty to this two-count Information charging him with sex trafficking of a minor, and with possession with intent to distribute heroin. Through his

---

[5] Ms. Bouthillier's guideline range, without the enhancement in U.S.S.G. § 5K2.1, was a range of 108 to 135 months. As noted above, however, the sentence actually imposed on her, however, was 48 months.

guilty plea on November 17, 2016, Mr. Gomez has taken responsibility for his actions. In his letter submitted to the Court in aid of sentencing, Mr. Gomez expresses shame and remorse for the choices he made which bring him before this Court. Since his arrest in June of 2016 Mr. Gomez has received help for his addiction to drugs. He is now sober and has been able to reflect on the path he was on, a path he is certainly not proud of and one to which he has vowed to never return.  He has taken advantage of the limited opportunities at Wyatt and has been a responsible person throughout his incarceration, as attested to by the letter of Ms. Singleton, the Program Director.

Our request, respectfully submitted to the Court, is that Mr. Gomez be sentenced as low as possible, thus reflecting the sentencing objectives of 18 USC §3553(a). Further, as Mr. Gomez would benefit from substance abuse counseling and treatment while in custody and upon release to the community, we respectfully request that he be sentenced to a facility in which he can enroll in the Residential Drug Abuse Program (RDAP), in particular the Federal Correctional Institution in Danbury, Connecticut, which will allow him to receive the substance abuse treatment he needs.

## II. Mr. Gomez's Background & History

### 1. Addiction

For the past 20 years, Mr. Gomez's life has been clouded with an addiction to drugs. Although his addiction has been festering since the late 90s, it progressed most rapidly beginning in 2013, after he received a prescription for opiates. Mr. Gomez's addiction hit its highest peak in the years prior to his arrest. As noted in his PSR, prior to his arrest and incarceration Mr. Gomez was using 120mg of methadone, plus heroin,

on a daily basis.

Mr. Gomez first started using cocaine when he was 21 years old. He recalls that at first, he used the substance only on the weekends. He described himself as having a "functional addiction." But in 2013 Mr. Gomez was prescribed opiates for an ankle injury and when his prescription ran out he began purchasing Percocet on the street. Mr. Gomez made up excuses for this use, justifying it as a way to treat the continued pain he felt in his ankle. But Mr. Gomez's opiate use went well beyond treatment for pain. Like many others, he quickly developed an addiction. Not long after receiving the prescription, well into his late 30s, Mr. Gomez reports that he began using heroin.

Mr. Gomez's heroin use escalated rapidly and quickly set him down a dangerous path. He began selling heroin to support his own habit. His desire and need to get high became one of the most important things in his life. His addiction took over his better judgment and caused him to make decisions that he looks back on with shame today.

### 2. Incarceration

Mr. Gomez was arrested on June 2, 2016 and has been incarcerated since. The first few months of his incarceration were extraordinarily difficult as he dealt with the painful and often immobilizing symptoms of withdrawal. He also had a difficult time coping with the circumstances surrounding this case and the fact that a young girl lost her life. He not only felt shame and sorrow, but regret for his actions. This period of incarceration, however painful, has nevertheless been a wakeup call for Mr. Gomez.

Mr. Gomez is now drug free. He has participated in and greatly benefited from mental health and substance abuse counseling at Wyatt and has learned about the

various ways to cope with his addiction. Although Mr. Gomez had previously participated in outpatient substance abuse programs, he had never participated in residential treatment. Despite the fact that he is now clean, he recognizes that he would benefit greatly from further substance abuse treatment to ensure that he is able to stay clean upon his release to the community.

Notably, Mr. Gomez has not received any disciplinary infractions while in state or federal custody. He reports that he mostly keeps to himself and has used this time to reflect on his past decisions and choices he made which bring him before the Court.

**3. Life After Addiction**

Mr. Gomez has vowed to not return to the path he was on prior to this arrest. He knows that a lifestyle consumed by the desire to get high is dangerous and destructive, not only to his own well-being but to the well-being of others dealing with similar addictions.

Mr. Gomez intends on setting himself down a different path with the help of his father, Michael Gomez, who has continued to provide him support throughout his incarceration. Michael Gomez works for himself doing small side jobs and Ramon intends to work with his father as a start. While incarcerated, he wants to eventually take the test to receive his GED, something he was working towards but failed to complete prior to this arrest.

### III. Guidelines Application

A sentence below both the advisory Guidelines range would satisfy the Second Circuit's recognition of the need to avoid unwarranted sentencing disparities while imposing "individualized justice." *See United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005). In accordance with 18 U.S.C. § 3553(a), the Court shall impose a sentence that is sufficient, but not greater than necessary to comply with the purposes outlined in paragraph 2. This provides the framework and factors to be considered by the sentencing judge in the determining the particular sentence to be imposed:

The Court, in determining the particular sentence to be imposed, shall consider:

   (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2)   the need for the sentence imposed--

      (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B)   to afford adequate deterrence to criminal conduct;

      (C)   to protect the public from further crimes of the defendant; and

      (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

      .....

18 U.S.C. § 3553(a). Pursuant to 18 U.S.C. § 3553(a)(6), the Court is also to "avoid unwarranted sentence disparities among other defendants with similar records who have been found guilty of similar conduct."

As the Court is well aware, the Guidelines are no longer mandatory or binding authority. *See United States v. Booker*, 543 U.S. 220 (2005). Although the sentencing

Court is still required to consider the sentencing range enumerated in the guidelines, it must also consider the factors listed under § 3553(a). *See Gall v. United States*, 552 U.S. 38 (2007). As the Second Circuit explained "[i]t is now, however, emphatically clear that the Guidelines are guidelines -- that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges are, as a result, generally free to impose sentences outside the recommended range." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).

In Mr. Gomez's case, while the Sentencing Guidelines would have advised a period of 151 to 188 months imprisonment, full consideration of the other § 3553(a) factors does not justify such a severe sentence. For the reasons articulated below, Mr. Gomez respectfully requests that the Court impose a sentence substantially below the guidelines range.

## IV. A Sentence Below the Guideline Range Is Reasonable and Appropriate in this Case

Without downplaying or minimizing in any way the harm caused by his actions in this case, Mr. Gomez respectfully submits that a non-Guidelines sentence is reasonable and appropriate here.  In weighing the factors set forth in § 3553, the Court is directed to impose a sentence that is "not greater than necessary" to meet the statutory purposes. The sentence should "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense."

Mr. Gomez recognizes that his offense is grave. He directed O.R. to the Flagship Inn, knowing that she was seventeen and would be engaging in prostitution. Indeed, he sought to profit from this by seeking a share of any illicit funds that she earned. Furthermore, he provided heroin to Adele Bouthillier, and it is possible that this heroin may have been the cause of O.R.'s death. While he fully accepts that a term of imprisonment is warranted here, we are requesting that this sentence be substantially below the Guidelines range. Such a sentence would take into account the seriousness of this offense, while taking into account the various factors under §3552 which warrant a non-Guidelines sentence.

This period of imprisonment has been a wake-up call for Mr. Gomez. Although his criminal history contains multiple arrests, he had never served longer than 11 months incarceration. Presently, has been incarcerated for over 17 months, and knows that he has more time ahead of him.

Section 4A1.3(b) of the Guidelines allows that a downward departure may be warranted if the "defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history." *See United States v. Rivers*, 50 F.3d 1126, 1131 (2d Cir. 1995) (sentencing judge should exercise discretion whenever he concludes that the criminal history calculation over-represents the seriousness of the defendant's prior record). Furthermore, the Second Circuit Court of Appeals has said a court should consider the "appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses." *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001). In *United States v. Aguilar*, 2010

11

U.S. Dist. LEXIS 6198 (S.D. N.Y. Jan. 2010), the Court noted that the proposed guideline sentence of 30 months, based on the defendant's Criminal History Category V, would result in a sentence that is 250% longer than any sentence previously imposed on the defendant. In that case, the Court noted that a downward departure of two criminal history points would bring the defendant to a guideline range of 18-24 months and that 18 months was in fact longer than any sentence previously received by the defendant. As such, they concluded, a sentence of 18 months properly gave consideration to his previous convictions.

If sentenced in this case to 10 years imprisonment, Mr. Gomez would receive a sentence that is over 990% longer than any sentence previously received. Such a long sentence is not warranted here.

**V. Conditions of Supervised Release**

In par. 128 of the PSR, there are detailed special conditions that the Court might consider during the period of post-conviction supervision.  With respect to subparagraphs (3), (6), (10) and (11), we respectfully submit that these provisions are not warranted here.  While it is true that Mr. Gomez did refer  O.R.  to the Flagship Inn for purposes of her engaging in prostitution, and that such conduct involves Sex Offender Registration, these provisions in question are directed towards individuals who have engaged in conduct directed towards children and not towards individuals who have acted non-violently and non-coercively towards 17 and one half-year old minors as was the case here.

12

Subparagraph (3) prohibits any association with children under the age of 18 except in the presence of a responsible adult who has both been advised of his conviction and who has been approved by the Probation Office.  While appropriate in cases involving child pornography or specific acts of child sexual abuse, this is not warranted here.

Similarly subparagraph (6) would prohibit Mr. Gomez from even taking his minor children or  grandchildren to the playground.  Mr. Gomez's conviction here does not warrant such a broad prohibition. Subparagraph (7) requiring both completion of sex offender treatment, and polygraph examinations is equally excessive in the circumstances of this case. The same objection applies to subparagraph (10) with its specific requirement of sex offender treatment and to subparagraph (11) which impacts on the use of electronic equipment, including computers.  While the latter condition may be warranted in child pornography cases, or situations where computers were used to lure minors, this is not the circumstance here.  For these reasons, these proposed conditions are objected to as unduly burdensome in this case.

**VI. Conclusion**

Mr. Gomez recognizes that his actions were not only illegal, but wrong. In taking responsibility for his wrongful behavior and taking the steps necessary to battle his addiction, Mr. Gomez has now set himself down a different path. Accordingly, the defendant respectfully requests that the Court impose a sentence substantially below the Guidelines range, which would sufficiently punish Mr. Gomez, while taking into account Mr. Gomez's individual characteristics. Further, the defendant respectfully

requests that the Court order his incarceration to the Federal Correctional Institution in

Danbury, Connecticut so that he may receive the substance abuse counseling he

needs to stay clean upon his release.

**THE DEFENDANT,**
**RAMON GOMEZ**


Michael O. Sheehan /s/
Sheehan, Reeve and Near
350 Orange Street, Suite 101
New Haven, CT   06511
(203) 787-9026 (phone)
(203) 787-9031 (fax)
msheehan@sheehanandreeve.com
Federal Bar No.  ct05450